UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| MELISSA F.E.,[1] <br><br> Plaintiff, <br><br> vs. <br><br> DR. KILOLO KIJAKAZI,[2] Acting Commissioner, Social Security Administration, <br><br> Defendant. | CIV. 20-5075-JLV <br><br><br> REDACTED ORDER |

## INTRODUCTION

Plaintiff filed a motion appealing the final decision of Dr. Kilolo Kijakazi,

Acting Commissioner of the Social Security Administration, finding her not

disabled.   (Docket 19).   Defendant denies plaintiff is entitled to benefits.

(Docket 23).   For the reasons stated below, plaintiff's motion to reverse the

---

[1]The Administrative Office of the Judiciary suggested the court be more mindful of protecting from public access the private information in Social Security opinions and orders.   For that reason, the Western Division of the District of South Dakota will use the first name and last initial of every non-governmental person mentioned in the opinion.   This includes the names of non-governmental parties appearing in case captions.

[2]Dr. Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021.   Pursuant to Fed. R. Civ. P. 25(d), Dr. Kijakazi is automatically substituted for Andrew Saul as the defendant in all pending social security cases.   No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g). Dr. Kijakazi will be referred to as the "Commissioner" for the remainder of this order.

decision of the Commissioner (Docket 19) is granted and defendant's motion to affirm the decision of the Commissioner (Docket 22) is denied.

## FACTUAL AND PROCEDURAL HISTORY

The court issued a briefing schedule requiring the parties to file a joint statement of material facts ("JSMF").   (Docket 15).   The parties filed their JSMF.   (Docket 16).   The parties' JSMF is incorporated by reference.   Further recitation of salient facts is incorporated in the discussion section of this order.

On April 9, 2018, plaintiff applied for disability insurance benefits and supplemental security income pursuant to Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-33 and 1381-83f, respectively.   (Docket 16 ¶ 1).   She alleged an onset of disability date of September 1, 2017.   Id.   On April 8, 2020, an ALJ issued a decision finding plaintiff not disabled from September 1, 2017, through the date of the ALJ's decision.   See Docket 14-1 at pp. 19-37.[3] Plaintiff sought review from the Appeals Council of the ALJ's decision.   (Docket 16 ¶ 4).   On October 27, 2020, the Appeals Council denied plaintiff's request for review.   Id.   The ALJ's April 8, 2020, decision constitutes the final decision of the Commissioner of the Social Security Administration.   It is from this decision which plaintiff timely appeals.

The issue before the court is whether the ALJ's decision plaintiff was not "under a disability, as defined in the Social Security Act, from September 1, 2017, through [April 8, 2020]" is supported by substantial evidence in the record

---

[3]The court cites to the page of the document as filed in CM/ECF as opposed to the page of the administrative record.

as a whole.   (Docket 14-1 at p. 37) (bold omitted); <u>see</u> <u>also</u> <u>Howard v. Massanari</u>, 255 F.3d 577, 580 (8th Cir. 2001) ("By statute, the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.") (internal quotation marks and brackets omitted) (citing 42 U.S.C. § 405(g)).

## STANDARD OF REVIEW

The Commissioner's findings must be upheld if they are supported by substantial evidence in the record as a whole.   42 U.S.C. § 405(g); <u>Choate v. Barnhart</u>, 457 F.3d 865, 869 (8th Cir. 2006); <u>Howard</u>, 255 F.3d at 580.   The court reviews the Commissioner's decision to determine if an error of law was committed.   <u>Smith v. Sullivan</u>, 982 F.2d 308, 311 (8th Cir. 1992).   "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."   <u>Cox v. Barnhart</u>, 471 F.3d 902, 906 (8th Cir. 2006) (internal citation and quotation marks omitted).

The review of a decision to deny benefits is "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision . . . [the court must also] take into account whatever in the record fairly detracts from that decision."   <u>Reed v. Barnhart</u>, 399 F.3d 917, 920 (8th Cir. 2005) (quoting <u>Haley v. Massanari</u>, 258 F.3d 742, 747 (8th Cir. 2001)).

It is not the role of the court to re-weigh the evidence and, even if this court would decide the case differently, it cannot reverse the Commissioner's decision if that decision is supported by good reason and is based on substantial evidence.   Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005).   A reviewing court may not reverse the Commissioner's decision " 'merely because substantial evidence would have supported an opposite decision.' "   Reed, 399 F.3d at 920 (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995)). Issues of law are reviewed *de novo* with deference given to the Commissioner's construction of the Social Security Act.   See Smith, 982 F.2d at 311.

The Social Security Administration established a five-step sequential evaluation process for determining whether an individual is disabled and entitled to disability insurance benefits under Title II or supplemental security income under Title XVI.   20 CFR § 404.1520(a) and 416.920(a).[4]   If the ALJ determines a claimant does not meet any step of the process, the evaluation does not proceed to the next step as the claimant is not disabled.   Id.   The five-step sequential evaluation process is:

> (1) whether the claimant is presently engaged in a "substantial gainful activity"; (2) whether the claimant has a severe impairment—one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience);

---

[4]The criteria under 20 CFR § 416.920 are the same as those under 20 CFR § 404.1520.   Boyd v. Sullivan, 960 F.2d 733, 735 (8th Cir. 1992). All further references will be to the regulations governing disability insurance benefits, unless otherwise specifically indicated.

(4) whether the claimant has the residual functional capacity to perform . . . past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove there are other jobs in the national economy the claimant can perform.

Baker v. Apfel, 159 F.3d 1140, 1143-44 (8th Cir. 1998).   The ALJ applied the five-step sequential evaluation required by the Social Security Administration regulations.   (Docket 14-1 at pp. 21-37).

**STEP ONE**

At step one, the ALJ determined plaintiff "has not engaged in substantial gainful activity since September 1, 2017, the . . . alleged onset [of disability]." Id. at p. 21 (bold omitted).   Plaintiff does not challenge this finding.   (Docket 19).

**STEP TWO**

At step two, the ALJ must decide whether the claimant has a medically determinable impairment that is severe or a combination of impairments that are severe.   20 CFR § 404.1520(c).   A medically determinable impairment can only be established by an acceptable medical source.   20 CFR § 404.1513(a). Accepted medical sources include, among others, licensed physicians.   Id.   "It is the claimant's burden to establish that his impairment or combination of impairments are severe."   Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007).

The regulations describe "severe impairment" in the negative.   "An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities."

5

20 CFR § 404.1521(a).   An impairment is not severe, however, if it "amounts to only a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities."   Kirby, 500 F.3d at 707. Thus, a severe impairment is one which significantly limits a claimant's physical or mental ability to do basic work activities.   A severe impairment or combination of impairments must meet the regulations' duration requirement that the impairment(s) are "expected to result in death" or otherwise "must have lasted or must be expected to last for a continuous period of at least 12 months." 20 CFR § 404.1509.

The ALJ identified plaintiff suffered from the following severe impairments: "[l]umbar degenerative disc disease; obesity; adjustment disorder with anxious mood; personality disorder (with preoccupation with somatic and/or cognitive concerns); depressive disorder; and panic disorder with agoraphobia."   (Docket 14-1 at p. 21) (bold omitted).   Plaintiff does not challenge this finding.   (Docket 19).

**STEP THREE**

At step three, the ALJ determines whether claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 ("Appendix 1"). 20 CFR §§ 404.1520(d), 404.1525 and 404.1526.   If a claimant's impairment or combination of impairments meets or medically equals the criteria for one of the impairments listed and meets the duration requirement of 20 CFR

§ 404.1509, the claimant is considered disabled.   At that point the Commissioner "acknowledges [the impairment or combination of impairments] are so severe as to preclude substantial gainful activity. . . . [and] the claimant is conclusively presumed to be disabled."   <u>Bowen v. Yuckert</u>, 482 U.S. 137, 141 (1987).   Plaintiff has the burden of proof that her impairment meets or equals the severity of one of the listed impairments.   <u>Johnson v. Barnhart</u>, 390 F.3d 1067, 1070 (8th Cir. 2004).

The ALJ determined plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in" Appendix 1.   (Docket 14-1 at p. 25) (bold omitted).   Plaintiff does not challenge this finding.   (Docket 19).

### **STEP FOUR**

At the outset of step four, the ALJ must determine a claimant's residual functional capacity ("RFC").   20 CFR § 404.1520(e).   A claimant's "impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what [the claimant] can do in a work setting." <u>Id.</u> § 404.1545(a)(1).   An RFC assessment is the ALJ's determination of "the most [claimant] can still do despite [her] limitations."   <u>Id.</u>   In assessing RFC, the ALJ considers "the total limiting effects" of a claimant's impairment(s)—i.e., all of a claimant's medically determinable impairments, even those that are not severe, and their resulting symptoms and limitations on the claimant's physical,

mental and sensory abilities.   Id. §§ 404.1545(e), 404.1545(b)-(d).   The ALJ must consider all relevant medical and non-medical evidence in the record. 20 CFR §§ 404.1520(e) and 404.1545; see also Lacroix v. Barnhart, 465 F.3d 881, 887 (8th Cir. 2006) ("The ALJ should determine a claimant's RFC based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [her] limitations." (quoting Strongson v. Barnhart, 361 F.3d 1066, 1070 (8th Cir. 2004))).

The ALJ uses the RFC assessment at step four to decide whether a claimant can perform her "past relevant work."   20 CFR § 404.1545(a)(5)(i).   If the ALJ finds the claimant can perform her past relevant work, the claimant is not disabled, as defined under the Social Security Act.   If the ALJ finds a claimant cannot perform her past relevant work, the ALJ proceeds to step five.

The ALJ found plaintiff has the RFC to perform light work.   (Docket 14-1 at p. 26).   Light work

> involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.   Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.   To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. . . .

20 CFR § 404.1567(b).   Specifically, the ALJ found plaintiff

> can frequently climb stairs and ramps; never climb ladders, ropes, or scaffolds; and frequently balance, stoop, kneel, crouch, and crawl.   She should avoid moderate exposure to loud noise, to vibration, and to hazards, such as unprotected heights and dangerous machinery.   She can perform simple, routine tasks,

8

> without simple work-related decisions and few workplace changes. She can occasionally interact with supervisors and co-workers, with no tandem tasks, and no public contact.

(Docket 14-1 at p. 26) (bold omitted).

Plaintiff challenges the ALJ's assessment of her RFC.   (Docket 19).   She alleges the ALJ improperly considered:

(1)    Plaintiff's testimony.   Id. at p. 32; and

(2)    The medical opinions of treating psychiatrist Dr. R.   Id. at p. 46.

The court will address plaintiff's claims in the order it deems most productive to resolution of the issues.

**Medical Opinions of Dr. R.**

The parties agree Dr. R.'s opinions must be considered in accord with the revised regulation governing evaluation of medical evidence.   See Dockets 19 at p. 46 and 23 at pp. 8-9 (referencing 20 CFR § 404.1520(c) (2017)).   Subsection 1520(c) requires an ALJ to consider (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors when judging medical opinions.   20 CFR § 404.1527c(c).   An ALJ is required to "articulate . . . how persuasive [the ALJ] find[s] all of the medical opinions and all of the prior administrative medical findings in . . . [the] record."   Id. § 404.1520c(b).   "Supportability" and "consistency" are the two most important factors in determining the persuasiveness of a medical opinion.   Id. § 404.1520c(b)(2).   The regulations continue to give greater consideration to a treating physician than a physician who only reviews the record.   "A medical

source may have a better understanding of your impairment(s) if he . . . examines you than if the medical source only reviews evidence in your folder."   Id. § 404.1520c(c)(3)(v).

The ALJ considered Dr. R.'s "mental limitation checkbox form [of] October 2019."   (Docket 14-1 at p. 30) (referencing Docket 14-4 at pp. 91-93).   After articulating a short summary of some of Dr. R.'s findings, the ALJ found Dr. R. concluded plaintiff had the following limitation:

- moderate[5] limitations in understanding, remembering, and carrying out simple instructions;

- marked[6] limitations in understanding, remembering, and carrying out complex instructions;

- marked limitations in the ability to make judgments in simple and complex work-related decisions;

- marked limitations interacting appropriately with the public;

- moderate limitations interacting appropriately with supervisors and co-workers;

- moderate limitations responding appropriately to usual work situations and to changes in a routine work setting; and

- [she] can manage benefits in her own best interests at times.

Id. (formatting modified for the ease of the reader); see also Docket 16 ¶¶ 236-38.   The ALJ found

---

[5]"Moderate" is determined to be "more than a slight limitation . . . but the individual is still able to function satisfactorily."   (Docket 14-4 at p. 91).

[6]"Marked" is determined to be a "serious limitation . . . [such that] [t]here is a substantial loss in the ability to effectively function."   (Docket 14-4 at p. 91).

Dr. R.'s opinion unpersuasive.  It is unsupported by Dr. H.['] extensive neuropsychological testing results.  Indeed, it is inconsistent with Dr. R.'s own 2019 mental status examinations, which only reported dull, depressed, flat/frozen effect [sic], hyper-talkative, and flat mood, signs that are not consistent with "marked" limitations.

(Docket 14-1 at p. 30).

Plaintiff objects to the ALJ's finding.   (Docket 19 at p. 48).   She submits Dr. R.'s opinions are "consistent with the treatment notes and . . . . also his expertise and experience as a psychiatrist."   Id.   Plaintiff asserts a comparison of the treatment notes of Social Worker Ms. T. are consistent with Dr. R.'s notes "and show mood swings showing dramatic shifts in mood, symptoms of anxiety and panic and limitations on [plaintiff's] activities and contact with other people." Id. at pp. 48-49.   Plaintiff argues her "inability to keep jobs due to her mood disorder is documented by the Social Security Administration's records[.]"   Id. at p. 49.   She contends "no mental health provider has even discussed the possibility that she return to gainful employment, even part-time."   For these reasons, plaintiff submits "Dr. R.'s opinions are supported and consistent."   Id. (emphasis and underlining omitted).   In conclusion, plaintiff argues

[T]he ALJ's finding that Dr. R.'s mental status examinations are inconsistent with his opinions regarding limitations is an example of the ALJ improperly substituting his own lay opinion for those of a medical expert . . . . This is an error of law."

Id. (references omitted).

Medical opinions are "statements from acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s),

including [their] symptoms, diagnosis and prognosis, what [claimant] can still do despite impairment(s), and [her] physical or mental restrictions."   20 CFR § 404.1527(a)(1).   Generally, greater weight is given to medical opinions from examining medical professionals compared to non-examining ones.   Id. § 404.1520c(c)(v).   Additionally, greater weight is given to opinions from treating sources—i.e., medical professionals who have an ongoing relationship with the claimant.   Id. § 404.1520c(c)(3).   A treating source's opinion on the nature and severity of a claimant's impairment(s) is given greater weight if the ALJ determines it is supported by "objective medical evidence" and the medical opinion is consistent "with the evidence from other medical sources."   Id. §§ 404.1520c(c)(1) & (2).

The ALJ found "Dr. R.'s opinion unpersuasive" because it was "unsupported" by the February 13, 2018, neuropsychological testing conducted by Dr. H.   (Docket 14-1 at p. 30).   Also, the ALJ discounted Dr. R.'s ultimate opinion because it was "inconsistent with [the doctor's] own 2019 mental status examinations."   Id.

The ALJ failed to acknowledge that Dr. H.'s psychological testing of plaintiff was conducted in February 2018.   (Docket 16 ¶¶ 18-25).   While Dr. H. reported the "results are unimpaired and within normal range for [plaintiff's] age . . ." the results indicated "probable invalidity due to over reporting and that there may be emotional distress including depression and anxiety with past history of suicidal ideation. . . . [And] there may also be over activation *possibly*

*indicating cyclic mood disorder.*"   Id. ¶¶ 25-26 (emphasis added; internal quotation marks and brackets omitted).   Dr. H.'s "diagnostic impressions included: adjustment disorder with anxious mood, normal neurocognitive functioning (with the exception of mild range impairment and visual memory), and rule out Schizoid personality disorder."   Id. ¶ 29.   The psychologist recommended plaintiff

> be observed over time regarding the possibility of a cycling mood disorder, given the fluctuation in symptoms reported. . . . *patient does not report previous diagnosis of cycling mood disorder (i.e. Bipolar II disorder),[7] but it should be ruled out given the observed and reported symptoms and behaviors.*

Id. ¶ 31 (emphasis added; internal quotation marks and brackets omitted).

When plaintiff was seen for the second and only other time in March 2018, by Dr. H., she noted in the chart "the test results showed intact neurocognitive functioning, but she had very high anxiety and could benefit from working with a therapist or counselor."   Id. ¶ 39 (internal quotation marked omitted).   Dr. H. recommended plaintiff seek therapeutic counseling with Ms. T. at Regional Neuropsychology to help plaintiff "adjust[] to her declining health and energy level."   Id.   Dr. H. also charted that "*a psychiatry consult would also potentially be of benefit.*"   Id. ¶ 41 (emphasis added).

Beginning in April 2018 and continuing through November 2019, plaintiff was seen 18 times by Ms. T., a clinical social worker at Regional Health.   (Docket

---

[7]Bipolar disorder, formerly called "manic depression," is a chronic condition involving mood swings with at least one episode of mania and repeated episodes of depression.   MedicineNet.com.

16 ¶¶ 42-54, 60-61, 64-73, 144-48, 167-73, 178-85, 190-92, 194-96).
Beginning with the first therapy session on April 2, 2018, Ms. T. noted it would
be important "to *assess for bipolar disorder and potential personality disorder*
*diagnoses.*"  Id. ¶ 51.   As will be discussed later, plaintiff's cyclical condition
proved this concern accurate.

    Dr. R. saw plaintiff six times over 20 months, from June 20, 2018, through
January 23, 2020, plus completed a narrative report to the Social Security
Administration in October 2018 and the Medical Source Statement of Ability to
Work Related Activities (Mental) report on October 9, 2019.   See Docket 16 at
¶¶ 74-83, 106-109, 156-60, 175-77, 186-189, 206-08 & 231-15.   Dr. R.'s initial
diagnosis in June 2018 was "major depression, bereavement, panic disorder
with agoraphobia,[8] and PTSD."   Id. ¶ 80.   He recommended a trial period of
"Lurasidone[9] . . . [and] Lorazepam.[10]"   Id.

---

[8]"Agoraphobia . . . is a type of anxiety disorder in which [an individual]
fear[s] and avoid[s] places or situations that might cause [the individual] to panic
and . . . feel trapped, helpless or embarrassed. . . . The anxiety is caused by fear
that there's no easy way to escape or get help if the anxiety intensifies."
https://www.mayoclinic.org/diseases-conditions/agoraphobia/symptoms-caus
es/syc-20355987 (last visited February 21, 2022).

    [9]Lurasidone belongs in the class of atypical antipsychotic drugs and is
used to treat schizophrenia and depression associated with bipolar disorder.   It
is intended to help an individual think more clearly, feel less nervous and
participate in everyday life.   It may also help decrease hallucinations, improve
mood, sleep, appetite and energy level.   https://www.webmd.com/drugs/2/
drug-155126/lurasidone-oral/details (last visited February 20, 2022).

    [10]Lorazepam is in the class of benzodiazepine drugs which acts on the
brain and central nervous system to treat anxiety.   https://www.webmd.com/
drugs/2/drug-8892-5244/lorazepam-oral/lorazepam-oral/details (last visited
February 20, 2022).

When Dr. R. saw plaintiff on July 18, 2018, he charted "her mood was considerably improved and was doing more with her kids although she had periods of irritability which happened nearly daily." Id. ¶ 82.   He noted her counseling with Ms. T.  Id. ¶ 83.   Dr. R. charted plaintiff's mood to be "midscale and she was less anxious and more optimistic."  Id.

Dr. R. filed a narrative report with the Social Security Administration on October 3, 2018, in which he wrote that plaintiff "had had approximately 30 jobs in her life but can't hold them because of mood issues."  Id. ¶¶ 106-07.   The report indicted "it is *quite possible that [plaintiff] suffers a Bipolar Disorder* but current diagnosis is Major Depression, Panic Disorder and PTSD."  Id. ¶ 109 (brackets omitted).

During a May 22, 2019, therapy session, Ms. T. discussed a possible bipolar disorder diagnosis with plaintiff because of her fluctuating energy and depression cycles.  Id. ¶¶ 144-47.   Plaintiff's mental status exam "revealed anxious and depressed mood, appropriate affect, hopelessness, no suicidal ideation, restless/broken sleep, and tearful in discussing shameful behaviors." Id. ¶ 148.

When Dr. R. saw plaintiff on June 19, 2019, it was obvious he had access to and was incorporating Ms. T.'s therapy notes in his treatment of plaintiff's condition: "Social worker . . . T.'s note suggested [plaintiff] had a manic episode in April but was depressed in the May visit."  Id.  ¶ 157.   Reviewing Ms. T.'s notes, Dr. R. observed plaintiff's "apparently expressed remorse at past

behaviors . . . may have occurred during hypomanic or manic episodes." Id. "Dr. R. wrote "*for the last year I have been tilting the treatment toward Bipolar Disorder and now it appears that that is the primary diagnosis.*" Id. (emphasis added; brackets omitted).   He noted plaintiff "quit all medication because of a heavy feeling in her head about three weeks ago and she feels numb, is avoidant of others, and has a lot of anxiety but only a few panic attacks since then." Id. ¶ 158.   Her "mental status exam revealed she was dull and flat and [her] mood was below midscale [possibly 3/10]." Id. ¶ 159.   Dr. R. *amended his diagnosis to include bipolar disorder* and "prescribed Ziprasidone[11] and Alprazolam.[12]" Id. ¶ 160.

During a July 29, 2019, therapy session, Ms. T. noted plaintiff's "mental status exam showed dysphoric[13] and anxious mood, appropriate affect, restless and broken sleep, and . . . her participation level was active/eager." Id. ¶ 168. Plaintiff's mental status changed during their therapy session on August 14,

---

[11]Ziprasidone is in a class of medications called atypical antipsychotics and is used to treat schizophrenia and bipolar disorder to help a patient think more clearly, feel less agitated and take a more active part in life. https://www.webmd.com/drugs/2/drug-20568/ziprasidone-oral/details (last visited February 20, 2022).

[12]Alprazolam is in the class of medications called benzodiazepines which act on the brain and nerves to treat anxiety and panic disorders to produce a calming effect.   https://www.webmd.com/drugs/2/drug-8171-7244/alprazolam-oral/alprazolam-oral/details (last visited February 20, 2022).

[13]Dysphoria is a psychological state of generalized unhappiness, restlessness, dissatisfaction, or frustration, and it can be a symptom of several mental health conditions that affect mood, such as depression and mania. https://www.goodtherapy.org/blog/psychpedia/dysphoria (last visited February 21, 2022).

2019, revealing "dysphoric and anxious mood, restricted affect and restless and broken sleep." Id. ¶ 169-170.

When seen by Dr. R. on August 29, 2019, he charted plaintiff

is locked in a depression . . . . blah and not caring about anything, including relationships with family or much of anything else. . . . her energy was low and she wants to sleep to avoid things during the day and her sleep at night is restless and she gets only four to five hours. . . . she was having headache pain of a sharp nature and her left eye was becoming blurry and she was losing hair and did not want to be in public. . . . she is not thinking clearly and does not know what to do next nor has she experimented.

Id. ¶ 175 (brackets omitted).   Dr. R. noted her mental status exam showed "she is clearly depressed with affect frozen in a dull mask.   She speaks in a low tone and there some plaintiveness."   Id. ¶ 177 (brackets omitted).   He charted "*her therapist feels that she is bipolar and I do as well*." Id. (emphasis added).   He prescribed Alprazolam and increased the Ziprasidone dosage.   Id. (brackets omitted).

On October 9, 2019, Ms. T. noted plaintiff's mental status exam had shifted to "euthymic[14] and anxious mood, expansive affect, and active/eager participation level."   Id. ¶¶ 184-85.   Later that same day when seen by Dr. R., he noted plaintiff "switched into mania in mid-September.   . . . Her thoughts began racing and concentration was poor."   Id. ¶ 186.   Dr. R. charted that Ms.

---

[14]Euthymia is a condition where an individual experiences feelings of tranquility and cheerfulness with an increased level of resilience to stress.   With depression at one end of the bipolar spectrum and mania at the other end, euthymia is a state of stable moods.   https://www.healthline.com/health/euthymic (last visited February 21, 2022).

T. thought plaintiff "was manic and of course this was correct."   Id. ¶ 187.   Dr.

R. noted plaintiff was

> hyper talkative and uses bad language. . . . she is full of energy and
> not at all tired. . . . there was some element of excitement within her,
> but it is mixed with negative thoughts about her life and the world she
> lives in. . . . dress and grooming are fine and she is still able to interact
> in an appropriate manner despite the bad language. . . . [Plaintiff] . . .
> was full of energy and not tired.

Id. ¶ 188 (internal quotation marks and brackets omitted).   "Dr. R. assessed

mixed mania and raised her Ziprasidone again. . . . recommended starting

Lithium Carbonate[15] as well as continuing . . . Alprazolam."   Id.

¶ 189.

On October 15, 2019, Dr. R. completed the Medical Source Statement of

Ability to Work Related Activities (Mental) report.   Id. ¶ 236.   Dr. R.'s principal

findings were that plaintiff had

- moderate limitations in understanding, remembering, and
  carrying out simple instructions;

- marked limitations in understanding, remembering, and carrying
  out complex instructions;

- marked limitations in the ability to make judgments in simple and
  complex work-related decisions;

- marked limitations interacting appropriately with the public;

---

[15]Lithium carbonate is used to treat bipolar disorder.   It works to restore
the balance of neurotransmitters in the brain to stabilize mood and reduce
extremes in behavior, decreasing the frequency of manic episodes and
decreasing the symptoms of manic episodes.   https://www.webmd.com/drugs
/2/drug-5887-795/lithium-carbonate-oral/lithium-controlled-release-oral/det
ails (last visited February 20, 2022).

- moderate limitations interacting appropriately with supervisors and co-workers; and

- moderate limitations responding appropriately to usual work situations and to changes in a routine work setting.

Id. ¶¶ 236-38.   In support of these opinions Dr. R. wrote plaintiff suffered

Sudden dramatic shifts in mood. Very unstable. Episodic intense anger. Panic disorder. Can't be in public except brief forays for necessities. . . . Energy, concentration and sleep are poor.   History of hallucinations. . . . Has had about 30 jobs; can't stay with them.

Id. ¶¶ 236 & 238.

When Dr. R. saw plaintiff on December 16, 2019, he noted she "was avoiding people around the holidays."   Id. ¶ 206.   Because a friend nearly died while on Lithium, plaintiff "became scared and quit . . . lithium."   Id.   The mental status exam noted plaintiff "was alert and oriented, mood was midscale or a notch lower, she speaks rapidly but relevantly about current circumstances and uses some bad words, however she seems sincere."   Id. ¶ 208.   Despite Dr. R.'s recommendation, plaintiff refused to go back on Lithium.   Id.

On January 23, 2020, Dr. R. saw plaintiff.   Id. ¶ 213.   He charted

she had been in a dysphoric manic state since going off meds a month ago. . . . she had ruined her friendships by saying things that were on her mind that were inappropriate. . . . [she] had some paranoia and was having nightmares about she and her child being murdered. . . . she had suicidal ideation as well as panic levels of anxiety and not infrequently, she is up 24 hours and has plenty of energy the next day.

Id. ¶¶ 213-14.   The mental status exam that day noted "she was anxious, fearful, and very distraught. . . . She begs me to do something so she can become normal and put her life back together."   Id. ¶ 215.   Plaintiff "was willing to use

19

the Alprazolam and Ziprasidone, but not Lithium."   Id.   "Dr. R. recommended

increasing . . . Ziprasidone and using the full dose of . . . Alprazolam."   Id.

It borders on disingenuous that the ALJ would find Dr. R.'s opinions

inconsistent with Dr. H.'s early testing in 2018 or Dr. R.'s own findings in 2019.

Dr. H.'s report is consistent with Dr. R.'s subsequent findings and diagnosis.   To

report only the test findings of 2018, but then ignore Dr. H.'s concerns about

plaintiff's mental health status ignores the reality of bipolar disorder.

"Conditions such as . . . bipolar disorder . . . are conditions commonly

known to wax and wane.   It is not unexpected for an individual with these

conditions to appear and act healthy, while at other times to suffer from the

extreme, debilitating problems these physical and mental conditions cause."

Dillon v. Colvin, 210 F. Supp. 3d 1198, 1209 (D.S.D. 2016) (internal citation

omitted).   Dr. R.'s examinations, charts and reports are consistent with the

psychological records of Dr. H. as well as the therapy records of Ms. T.   Dr. R.'s

clinical work together with his prescribing powerful mood-altering medications is

supported by the work of Ms. T. as well as other physicians who examined and

treated plaintiff in 2018-2020.

> In April 2018, Neurologist Dr. V. found plaintiff had "a generalized
> anxiety disorder in addition to question of underlying personality
> disorder as raised through formal neuropsychological testing."
> Docket 16 ¶¶ 55-59;
>
> In January 2019, Neurologist Dr. S. noted a Mayo Clinic neurologist
> diagnosed plaintiff with a "possible mood disorder."   Id. ¶ 123.   Yet,
> his own mental status examination of plaintiff that day, Dr. S. found
> her "mood and affect were normal."   Id. ¶ 124;

20

In July 2019, Dr. S. charted plaintiff's psychiatric and behavioral systems as a "dysphoric mood and sleep disturbance and [she] was nervous and anxious and is under mental health treatment. . . . her mood and affect were flat and she had many somatic complaints along with normal speech and normal gait."  Id. ¶¶161-63.   Dr. S. diagnosed abnormal brain MRI, fibromyalgia, migraine without status migrainosus, not intractable, unspecified migraine type and multiple neurological symptoms.  Id. ¶ 164;

In November 2019, Dr. S. noted plaintiff's psychiatric symptoms were "positive for dysphoric mood and sleep disturbance and [she] is nervous/anxious. . . . her mood and affect were flat and she had many somatic complaints although her recent and remote memory were normal, her attention and concentration were normal and her speech, level of consciousness and knowledge were normal."  Id. ¶¶ 202-05 (internal quotation marks omitted); and

In January 2020, Dr. S. noted plaintiff's "mood and affect were not as flat as previous visits and she had many somatic complaints ongoing but reduced from last visit."  Id. ¶ 209.

The records developed by the neurologists as well as Ms. T.'s and Dr. R.'s records support the mental health reality that plaintiff's bipolar disorder waxed and waned.  Dillon, 210 F. Supp. 3d at 1209.

Rather than give greater consideration to Dr. R.'s opinions and conclusions supported by these other physicians, the ALJ chose to adopt the findings of two consulting physicians who completed paper reviews of the record in August 2018 and February 2019.   (Docket 14-1 at p. 30) (referencing Docket 16 ¶ 233 & 235).   The ALJ justified this decision by finding any

new treatment records submitted after they issued their findings do not contain any psychological testing results, normal and abnormal mental status examination signs, or mental health treatment that is either inconsistent or in conflict with the testing results, mental status examination signs, and treatment in the records they had available for review.

21

Id.  This is simply wrong.   Plaintiff's records discussed above not only disprove such a finding but resoundingly disclose that plaintiff's bipolar disorder remained uncontrolled with medications and she was unable to function normally.   Dr. R.'s medical diagnosis, opinions and treatment regime support the conclusions he provided to the Social Security Administration on October 15, 2019, and are entitled to greater weight than physicians who only reviewed the early record in the case.   20 CFR §§ 404.1520c(b)(2) & (c)(3)(v).

The ALJ erred, both factually and as a matter of law, when he chose to give substantial weight to the opinions of the consulting physicians.   The Commissioner's findings on this issue are not supported by substantial evidence in the record as a whole.   42 U.S.C. § 405(g); Choate, 457 F.3d at 869.

**B.    Credibility of Plaintiff**

The ALJ's decision to dismiss Dr. R.'s opinions affected the decision to discount plaintiff's testimony.

> I find the degree and persistence of several of the claimant's alleged symptoms, e.g., deteriorating memory, anger/outbursts, needing special reminders to take medications, needing special reminders to take care of personal needs/grooming, unable to prepare meals due to poor concentration, having difficulty with math now, needing reminders to go places, only able to pay attention for a couple of minutes at one time, and unable to follow spoken instructions, as well as difficulty handling changes in routine, communicating, completing tasks, concentrating, understanding, and finishing what she starts, are inconsistent with the three mild and one moderate "paragraph B" criteria findings, . . . as well as with [the consulting physicians'] persuasive prior administrative medical findings.

Docket 14-1 at p. 34.

Without detailing the specifics of plaintiff's testimony, the court concludes there are no inconsistencies between plaintiff's testimony and the testimony of her health care providers that justify a finding plaintiff not credible.   See Docket 16 ¶¶ 239-68.   The evidence supporting plaintiff's credibility "fairly detracts from [the Commissioner's] decision."   Reed, 399 F.3d at 920 (quoting Haley, 258 F.3d at 747); Morse v. Shalala, 32 F.3d 1228, 1229 (8th Cir. 1994).   When examined in detail, the record supports rather than contradicts plaintiff's testimony.   Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Guilliams, 393 F.3d at 801-02.

### C.   Jobs Available to Plaintiff

The "burden of production shifts to the Commissioner at step five." Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004); see also Baker, 159 F.3d at 1144.

A vocational expert ("VE") testified during the administrative hearing. (Docket 14-1 at pp. 77-85; see also Docket 16 ¶¶ 269-75).   The VE testified that outside of regularly scheduled breaks the most time off task an employer would tolerate in unskilled jobs would be about five percent.   Id. ¶ 272.   If an individual inappropriately responded to changes in routine work assignments "five percent of the time, that would be very problematic especially after one or two times."   Id. ¶ 274 (internal quotation marks omitted).   If the individual missed more than one day a month, the VE stated that "would preclude work." (Docket 16 ¶ 273).   The VE testified if an individual is unable to make judgments on simple work-related decisions ten percent of the time, that would not permit

employment in a "competitive work venue."   Id. ¶ 275.   In other words, applying Dr. R.'s opinions, there are no jobs available to plaintiff.

### D.   Conclusion

The court may affirm, modify, or reverse the Commissioner's decision, with or without remand to the Commissioner for a rehearing. 42 U.S.C. § 409(g).   If the court determines that the "record overwhelmingly supports a disability finding and remand would merely delay the receipt of benefits to which the plaintiff is entitled, reversal is appropriate."   Thompson v. Sullivan, 957 F.2d 611, 614 (8th Cir. 1992).   Remand to the Commissioner is neither necessary nor appropriate in this case.   Plaintiff is disabled and entitled to benefits.   Reversal is the appropriate remedy at this juncture.   Thompson, supra.

### ORDER

Based on the above analysis, it is

ORDERED that plaintiff's motion (Docket 19) is granted and the decision of the Commissioner of April 8, 2020, is reversed and the case is remanded to the Commissioner for the purpose of calculating and awarding benefits to the plaintiff.

IT IS FURTHER ORDERED that defendant's motion to affirm (Docket 22) is denied.

Dated April 28, 2022.

BY THE COURT:

/s/ *Jeffrey L. Viken*

JEFFREY L. VIKEN
UNITED STATES DISTRICT JUDGE